### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KRISTIN LESLIE, *et al.*,<br>　　　　　Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 5:25-cv-01423-JLS |
| | : | |
| RENTOKIL NORTH AMERICA, INC, | : | |
| 　　　　　Defendant. | : | |

### MEMORANDUM

**SCHMEHL, J.**                                                      **April 8 , 2026**

Plaintiffs brought this action individually and on behalf of all similarly situated former and current employees of Defendant Rentokil North America, Inc ("Rentokil") who are participants and beneficiaries enrolled in Rentokil's Employee Benefit Plan (the "Plan") to recover allegedly unlawful tobacco surcharges that Plaintiffs were forced to pay in order to maintain health insurance coverage under the Plan. Plaintiffs claim that, under the Plan, Rentokil imposes a tobacco surcharge without providing participants with a reasonable alternative standard and without providing notice of the availability of a reasonable alternative standard in violation of the non-discrimination provisions of ERISA. 29 U.S.C. § 1182.   Plaintiffs also claim that Rentokil breached its fiduciary duty to plan participants in violation of 29 U.S.C. §§ 1104, 1106. Presently before the Court is Rentokil's motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure and for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The parties have filed responses and replies to the motion to dismiss as well as citations to multiple supplemental authority in support of their respective positions. For the reasons that follow, the motion is denied.

## STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 571 (2007)). When making its decision, the court accepts as true all facts alleged in the complaint and draws all reasonable inferences from them. *Monroe v. Beard,* 536 F.3d 198, 205 (3d Cir.2008); *Adams v. Teamsters Local 115,* 214 F. App'x 167, 171 (3d Cir.2007). Though a complaint need not contain detailed factual allegations, it requires more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft,* 556 U.S. at 678 (citations omitted). A court may therefore take the facts alleged in the complaint as true, but need not consider legal conclusions contained therein. *Iqbal,* 556 U.S. at 678; *Twombly,* 550 U.S. at 555.

A motion to dismiss pursuant to Rule 12(b)(1) requires a different analysis than one pursuant to Rule 12(b)(6). *See Gould Elecs. Inc. v. U.S.,* 220 F.3d 169, 178 (3d Cir.2000) ("This Court has previously cautioned against treating a Rule 12(b)(1) motion as a Rule 12(b)(6) motion and reaching the merits of the claims.... This concern arises because the standard for surviving a Rule 12(b)(1) motion is lower than that for a Rule 12(b)(6) motion" (internal citations omitted)). In deciding a motion to dismiss under Rule 12(b)(1), the court must first determine whether the attack on jurisdiction is facial or factual. *U.S. ex rel. Atkinson v. Pa. Shipbuilding Co.,* 473 F.3d 506, 514 (3d Cir. 2007). If, as here, it is a facial attack, the court looks only to the pleadings and does so in the light most favorable to the plaintiff. *Id.* If it is a factual attack, the court may review evidence outside of the pleadings. *Id.* In the latter case, the burden rests on the plaintiff to establish jurisdiction. *Id.* A claim is dismissed under Rule 12(b)(1) only if it "clearly appears to be

**2**

immaterial and made solely for the purpose of obtaining jurisdiction or is wholly insubstantial and frivolous." *Gould Elecs. Inc.,* 220 F.3d at 178 (internal quotation marks omitted).

**FACTUAL BACKGROUND**

Plaintiff Kristin Leslie ("Leslie") is a citizen of the State of Missouri. ECF 1 at ¶12. Leslie alleges that she "was an employee of Rentokil, who paid a tobacco surcharge in the form of increased premiums for health insurance for her and her family of roughly $150 per month (roughly $1,800 annually)." *Id.*

Plaintiff Amy Ross ("Ross") is a citizen of the State of Delaware. *Id.* at ¶13. Ross alleges that she "is an employee of Rentokil, who paid a tobacco surcharge in the form of increased premiums for health insurance for herself offered through Rentokil during her employment." *Id.*

Both Plaintiffs allege that they were required to pay the tobacco surcharge to maintain health insurance under the Plan. *Id.* at ¶¶12, 13.

Rentokil is a Pennsylvania corporation and "a leading provider of pest control and related services across the country" *Id.* at ¶15. The Complaint alleges that "Rentokil is the sponsor of the Plan and the Plan Administrator under 29 U.S.C. § 1002(16)." *Id.* at ¶16. According to the Complaint, there were over 10,000 participants in the Plan as of December 31, 2023. *Id.* The Plan is "subject to the provisions and statutory requirements of ERISA pursuant to 29 U.S.C. § 1002(3)." *Id.*

The Plan includes a wellness program that is designed to encourage participants to be tobacco-free. Under the terms of the wellness program, participants are required to pay a higher medical plan premium if they continue to use tobacco products. *Id.* at ¶¶12-13, 64.

3

## DISCUSSION

In Count I, Plaintiffs claim that the tobacco surcharge violates ERISA's anti-discriminatory provisions because Rentokil does not offer a reasonable alternative standard to being tobacco-free, fails to provide proper notice of the reasonable standard to being tobacco-free and does not offer reimbursement of the tobacco surcharge paid by participants prior to their completion of a smoking cessation program. 29 U.S.C. § 1182(b)(1). This provision provides that:

> A group health plan ... may not require any individual ... to pay a premium or contribution which is greater than such premium or contribution for a similarly situated individual enrolled in the plan on the basis of any health status-related factor[1] in relation to the individual or to an individual enrolled under the plan as a dependent of the individual.

29 U.S.C. § 1182(b)(1).

However, §1182(b)(2)(B) contains an exception which allows a plan to issue discounts to participants who comply with a wellness program:

> [n]othing in paragraph [b](1) shall be construed ... to prevent a group health plan ... from establishing premium discounts or rebates or modifying otherwise applicable copayments or deductibles in return for adherence to programs of health promotion and disease prevention.

29 U.S.C. § 1182(b)(2)(B).

"In 2010, Congress amended the Public Health Safety Act ("PHSA") to add wellness program requirements and specifically incorporated Section 2705 of the PHSA into ERISA." *Bokma v. Performance Food Grp., Inc.*, No. 3:24CV686 (DJN), 2025 WL 1452042, at

---

[1] Under ERISA, a health status factor includes health status, medical condition, claims experience, receipt of health care, medical history, genetic information, evidence of insurability, disability. 29 U.S.C. 1182(a)(1)(A)-(H).

4

*1 (E.D. Va. May 20, 2025) (citing 29 U.S.C. § 1185d(a)(1)) (PHSA provisions "apply to group health plans" which fall under ERISA). Section 2705 of the PHSA requires wellness programs offered by employers to (1) "be reasonably designed to promote health or prevent disease;" (2) allow individuals eligible for the program to qualify for the program . . . at least once each year;" (3) make available the "full reward" to all similarly situated individuals; and (4) "disclose in all plan materials describing the terms of the wellness program the availability of a reasonable alternative standard." 42 U.S.C. § 300gg-4(j)(3)(B)–(E). The statute further clarifies what it means for the "full reward" to be made available to all similarly situated individuals, specifying that this requirement is not met "unless the wellness program allows ... for a reasonable alternative standard ... for obtaining the reward for any individual for whom, for that period, it is unreasonably difficult due to a medical condition [i.e. nicotine addiction] to satisfy the otherwise applicable standard" or "for whom ... it is medically inadvisable to attempt to satisfy the otherwise applicable standard." *Id.* at § 300gg-4(j)(3)(D).

In 2013, the Departments of Labor, Health and Human Services and the Treasury (the "Departments") promulgated regulations (the "2013 Regulations") for qualifying outcome-based wellness programs like tobacco cessation programs. [2] *See* Incentives for Nondiscriminatory Wellness Programs in Group Health Plans, 78 Fed. Reg. 33158, 33181–86 (June 3, 2013) (codified

---

[2] An outcome-based wellness program is "a type of health-contingent wellness program that requires an individual to attain or maintain a specific health outcome (such as not smoking ...) in order to obtain a reward." 29 C.F.R. § 2590.702(f)(1)(v). For individuals who "do not attain or maintain the specific health outcome, compliance with an educational program [such as a smoking cessation program] ... may be offered as an alternative to achieve the same reward." *Id.* In the context of a tobacco-free program, the "reward" may include the avoidance of a surcharge for tobacco use.

An activity-based wellness program, on the other hand, is a type of "health-contingent wellness program that requires an individual to perform or complete an activity [such as obtaining a COVID-19 vaccination] related to a health factor in order to obtain a reward but does not require the individual to attain or maintain a specific health outcome." 29 C.F.R. § 2590.702(f)(1)(iv). In the context of a vaccine wellness program, the "reward" may include the avoidance of a surcharge for getting vaccinated.

at 29 C.F.R. § 2590.702)). By doing so, the Departments emphasized that "every individual participating in [a wellness] program should be able to receive the full amount of any reward or incentive, regardless of any health factor." *Id.* at \*2 (quoting *id.* at 33160). Among other things, the regulation explained that wellness programs (including outcome-and activity-based wellness programs) meeting specific requirements fall under an "exception to the general prohibitions against discrimination." 29 C.F.R. § 2590.702(f), (f)(1)(iv)–(v).

Under the 2013 Regulations, outcome-based wellness programs, including tobacco cessation programs, must satisfy five conditions. *See* 29 C.F.R. 2590.72(f)(4)(i)-(v). 78 Fed. Reg. 33158, 33160 (explaining that the regulations provide "criteria for a program of health promotion or disease prevention ... *that must be satisfied* in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status" (emphasis added). First, individuals "must receive at least one opportunity per year to qualify for the reward." *Id.* (quoting § 2590.702(f)(4)(i)); *see also* 42 U.S.C. § 300gg-4(j)(3)(C). "Second, the reward must not exceed a specified percentage of the 'cost of employee-only coverage under the plan.'" *Id.* (quoting § 2590.702(f)(4)(ii)). "Third, the program 'must be reasonably designed to promote health or prevent disease.'" *Id.* (quoting 29 C.F.R. § 2590.702(f)(4)(iii)). Fourth, "[t]he full reward ... must be available to all similarly situated individuals," which requires a "reasonable alternative standard [or waiver] ... for any individual who does not meet the initial standard." *Id.* (quoting 29 C.F.R. § 2590.702(f)(4)(iv)(A)); *see also* 42 U.S.C. § 300gg-4(j)(3)(D). "The plan must also accommodate the recommendations of an individual's personal physician if that physician deems a plan standard 'not medically appropriate for that individual.'" *Id.* (quoting 29 C.F.R. § 2590.702(f)(4)(iv)(C)); *see also* 42 U.S.C. § 300gg-4(j)(3)(D)(ii). Fifth, the plan must "disclose in all plan materials [and 'in any disclosure that an

6

individual did not satisfy the initial outcome-based standard'] describing the terms of an outcome-based wellness program ... the availability of a reasonable alternative standard." 29 C.F.R. § 2590.702(f)(4)(v); *see also* 42 U.S.C. § 300gg-4(j)(3)(E). "This disclosure must include 'contact information for obtaining a reasonable alternative standard and a statement that recommendations of an individual's personal physician will be accommodated.'" *Bokma*, 2025 WL 1452042, at *2 (quoting *id.*). But, if a plan's "materials merely mention that such a program is available, without describing its terms, this disclosure is not required." 29 C.F.R. § 2590.702(f)(4)(v).

> Plaintiffs argue that the Plan violates all five of these requirements as follows:

> First, the program is not reasonably designed to promote health or prevent disease; it operates solely as a cost-shifting device. Second, there is no meaningful annual opportunity to earn the reward, because no alternative standard is available at any point. Third, Rentokil provides no notice of a reasonable alternative standard—either in the Plan, SPD, or any participant communications—as required by law. See 29 C.F.R. § 2590.702(f)(4)(v), 45 C.F.R. § 146.121(f)(4)(v). Fourth, there is no mechanism to ensure that participants who satisfy an alternative standard receive the "full reward," as retroactive reimbursements are not available. Fifth, Rentokil fails to accommodate physician recommendations…

ECF 14 at p. 9.

The Complaint alleges that "Rentokil does not provide participants with any reasonable alternative standard to avoid the tobacco surcharge it imposes on participants. There is no smoking cessation program, waiver, or alternative route for tobacco users to obtain the 'full reward' (i.e., avoiding the surcharge). The only avenue for smokers to avoid the surcharge is to quit smoking and then submit to the benefits department that no one uses tobacco. Thus, tobacco users (and their family members) are penalized based solely on their status as smokers, which violates ERISA's non-discrimination provisions." ECF 1 at ¶ 38.

The Complaint also alleges that the Plan "unlawfully penalizes participants based on the tobacco use of their covered family members, imposing a surcharge on the entire household even if only one member uses tobacco." *Id.* at ¶ 39.

Plaintiffs further allege that "Rentokil's Plan materials—the Plan document, SPD, and, upon information and belief, the annual benefits guides—fail entirely to mention the availability of a reasonable alternative standard because no such alternative exists. Without this disclosure, participants are unaware of their rights under ERISA and cannot access alternative means to avoid the surcharge." *Id.* at 42.

According to Plaintiffs, Rentokil should have 1) "implemented a reasonable alternative standard in the form of a smoking cessation program that allowed users to avoid the surcharge for the entire plan year, regardless of whether they quit using tobacco;" 2) "offered the program at no cost to participants and ensured that it was accessible and not overly burdensome by, for example, providing for convenient times and locations;" 3) "ensured that the program provided those who completed it with the 'full reward' through reimbursements or pro rata adjustments to insurance premiums;" and 4) "tied the surcharge to individual insureds rather than applying it broadly to the entire household, ensuring that only tobacco users, and not their non-smoking family members, were subject to the additional cost." *Id.* at ¶40.

Finally, the Complaint alleges that "Rentokil should have included clear and specific notice of the availability of the reasonable alternative standard in all Plan materials discussing the surcharge." *Id.* at ¶ 41.

1.   Rule 12(b)(1) motion to dismiss

In its motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), Rentokil argues that Plaintiffs have failed to establish standing to sue.

Article III of the United States Constitution "gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 593 U.S. 659, 668, (2021). "That power includes the requirement that litigants have standing." *Id.* The "irreducible constitutional minimum" of standing consists of three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* There is no ERISA exception to the standing requirements of Article III. *Thole v. U. S. Bank N.A.*, 590 U.S. 538, 547 (2020).

Rentokil argues that since Plaintiffs have failed to allege that it would have been "unreasonably difficult due to a medical condition" or "medically inadvisable" for them to cease using tobacco products, that they requested an alternative to the expected standard of being tobacco-free, that they requested a waiver of the expected standard of being tobacco-free, or that they were interested in being tobacco-free, or even attempted to be tobacco-free, at any point in time they have failed to satisfy the statutory requirements of 42 U.S.C. § 300gg-4(j)(3)(E). According to Rentokil, "[a]bsent such allegations, Plaintiffs were not excused from the expected standard of being tobacco-free. Because Plaintiffs have not alleged any facts showing that they were eligible to be excused from the standard of being tobacco-free, they could not have suffered an injury in fact caused by the alleged failure to provide a reasonable alternative standard to being tobacco-free." ECF 11-2, p. 13.

9

Rentokil also argues that it follows that "the lack of a concrete injury-in-fact precludes Plaintiffs from having the standing necessary to assert any claims based on the allegedly inadequate notice of the alternative standard to being tobacco-free (i.e., completion of a free tobacco cessation program) or the alleged failure to provide retroactive reimbursement of the Tobacco Surcharges upon completion of the alternative standard because Plaintiffs were never eligible for the reasonable alternative standard." *Id.* at 14.

Rentokil concludes by arguing that "[g]iven that Plaintiffs lack a concrete injury-in-fact that is traceable to the Company's alleged failure to provide Plaintiffs with a reasonable alternative standard to being tobacco-free and notice of the same, their ERISA § 702 claims should be dismissed pursuant to Rule 12(b)(1)." *Id.* at 15.

Rentokil, however, ignores the language of the 2013 Regulations that eliminated the "unreasonably difficult due to a medical condition" or "medically inadvisable" requirement that ERISA imposed on outcome-based programs. 42 U.S.C § 300gg-4(j)(3)(D). Indeed, the 2013 Regulations merely require that for outcome-based programs "[t]he full reward ... must be available to all similarly situated individuals," which requires a "reasonable alternative standard [or waiver] ... for **any individual** who does not meet the initial standard." *Id.* (quoting 29 C.F.R. § 2590.702(f)(4)(iv)(A)); *see also* 42 U.S.C. § 300gg-4(j)(3)(D) (emphasis added.) For activity-based programs, on the other hand, the 2013 Regulations, like the statute, still limit the alternative standard requirement to whom "it is unreasonably difficult due to a medical condition" or "medically inadvisable" to meet the program's standard. *See* 29 C.F.R. § 2590.702(f)(3)(iv)(A).

Rentokil acknowledges that the 2013 Regulations eliminated the "unreasonably difficult due to a medical condition" or "medically inadvisable" requirement that ERISA imposed on outcome-based programs, but argues that the 2013 Regulations are themselves invalid.

**10**

According to Rentokil, the 2013 Regulations are invalid because they "deviate[] significantly from the statute" by invalidly eliminating the statutory requirement for activity-based and outcome-based programs that a participant establish that it would be "medically inadvisable" or "unreasonably difficult due to a medical condition" for them to comply with the expected standard of being tobacco-free in order to be eligible for an alternative standard. ECF 11-2, p. 9 citing 29 C.F.R. §§ 2590.702(f)(1)(v), (f)(4)(iv). Rentokil argues that since the 2013 Regulations conflict with the statutory language of ERISA, the 2013 Regulations are invalid.

In the first instance, at least two courts have found that ERISA and the 2013 Regulations do not conflict. *See Bailey v. Sedgwick Claims Mgmt. Servs. Inc.*, 2025 WL 2779899, at *9 (W.D. Tenn. Sept. 26, 2025). ("The Court is not convinced at this stage that the PHSA and the regulation differ in any material way."); *Bokma*, 783 F.Supp.3d at 907 ("The Court finds no contradiction or conflict between the ERISA statute, which explicitly incorporated Section 2705 of the PHSA, and the DOL regulations, which also address the wellness program requirements articulated in Section 2705.") Second, the PHSA specifically provides that "[n]othing in this section shall be construed as prohibiting the Secretaries of Labor, Health and Human Services, or the Treasury from promulgating regulations in connection with this section." 42 U.S.C. § 300gg-4(n); *see also* 29 U.S.C. § 1191c ("The Secretary, consistent with section 104 of the Health Care Portability and Accountability Act of 1996, may promulgate such regulations as may be necessary or appropriate to carry out the provisions of this part."). In other words, Congress expressly granted the Departments the authority to establish regulations to effectuate and clarify the application of the PHSA. And the 2013 Regulations appear to do just that by clarifying the requirements for only outcome-based programs, not activity-based programs. Indeed, the 2013 Regulations distinguish between activity-based and outcome-based programs, by making clear that outcome-based

11

programs must offer a reasonable alternative standard to **any** participant who fails to meet the initial outcome, regardless of medical hardship. See 29 C.F.R. § 146.121(f)(4)(iv)(A). The Departments explained in the preamble to the 2013 Regulations, that Congress's requirements of medical inadvisability or a medical condition to avoid the expected standard were intentionally removed from outcome-based programs in order to "ensure that the program is reasonably designed to improve health and is not a subterfuge for underwriting or reducing benefits based on health status." 78 Fed. Reg. 33158 at 33160; *see also Chirinian v. Travelers Companies, Inc.,* 2025 WL 2147271, at *10 (D. Minn. July 29, 2025) ("But the bare fact that regulations 'fill up the details' of a statutory scheme does not render those regulations invalid . . ."); *Bailey,* 2025 WL 2779899, at *9. ("Sedgwick glosses over the possibility that, rather than conflicting with the PHSA, the regulatory framework properly fills in its details and clarifies the requirements for outcome-based programs.")

The 2013 Regulations have been in force since 2014. *See* 2013 Regulations, 33192 ("These final regulations generally apply to group health plans ... for plan years beginning on or after January 1, 2014"). Rentokil fails to identify a single case in which a defendant successfully challenged the validity of the 2013 Regulations within a motion to dismiss. For these reasons, the Court rejects Rentokil's argument that the 2013 Regulations are invalid.[3]

Having resolved the issue of the validity of the 2013 Regulations, the Court finds that Plaintiffs satisfy the requirement for Article III standing by plausibly alleging that Rentokil

---

[3] In *Wilson* v. *Whole Food Market, Inc.* 2026 WL 196517 (W.D. Tex. January 20, 2026), the Court held that even if the medical hardship standard still applied to outcome-based programs after the 2013 Regulations, Plaintiffs' failure to allege that engaging in tobacco abstinence would have been medically inadvisable or unreasonably difficult does not matter. The Court reasoned that "Plaintiff's claim does not depend on whether or not they were even eligible to participate in the cessation program; rather, the question is whether the cessation program is non-compliant, thereby rendering the surcharge Plaintiffs paid unlawful. Accordingly, they were not required to allege medical hardship, and failure to do so does not warrant dismissal of their unlawful surcharge claim." *Wilson, 2026 WL 196517, at * 11.*

caused them a concrete injury when it imposed a tobacco surcharge that is traceable to Rentokil's decision to impose tobacco surcharges under a discriminatory ERISA plan[4], which can be redressed with a refund of the surcharge which Plaintiffs seek in their Prayer for Relief. ECF 1, pp. 29-31. *Knight v. LHC Group, Inc.*, 2026 WL 513477 (W.D. La. February 24, 2026) *affirming Report and Recommendation in Knight v. LHC Group, Inc.*, 2025 WL 4351515 at * 3 (W.D. La. November 18, 2025); *Fisher v. Gardaword Cash Service, Inc.*, 2025 WL 248427, at *7 (W.D.N.C. August 28 2025); *Chirinian* 2025 WL 2147271, at *5 (finding Article III standing under materially identical circumstances); *see also Mehlberg v. Compass Grp. USA, Inc.*, 2025 WL 1260700, at *3–4 ; *Bokma*, 2025 WL 1452042, at *6.

Rentokil also argues that Plaintiffs lack standing to assert their alleged informational injuries such as Rentokil's failure to disclose the existence of a reasonable alternative standard or its obligation to accommodate physician recommendations. According to Rentokil, Plaintiffs must allege "downstream consequences" from failing to receive the required information in order to have standing to assert such claims. Courts have found that when a failure to disclose contributes to a financial injury, standing is established. See *Bokma*, 738 F. Supp. 3d at 906-907 (finding that the plaintiffs sufficiently stated a claim for lack of notice); *Mehlberg*, 2025 WL 1260700, at *4 (accepting the plaintiffs' argument that "a legally deficient notice confers standing when coupled with an actual monetary loss.") In addition, at least two courts have concluded that a plaintiff need not show downstream consequences where, as here, Plaintiff is not alleging that the failure to notify injured her but is alleging that the failure to notify makes the

---

[4] Rentokil argues that Plaintiffs' financial injuries can be traced to their decision to use tobacco products rather than to any actions by Rentokil. While Plaintiffs' use of tobacco products may have played a role in Plaintiffs' financial injuries, it was ultimately Rentokil's decision to impose a surcharge without offering a reasonable alternative to avoid it (as required by the 2013 Regulations) that directly led to Plaintiffs paying a higher premium for health insurance.

surcharge itself illegal, thereby resulting in direct injury to Plaintiff. *Wilson*, 2026 WL 196517, at * 6; *Bailey*, 2025 WL 2779899, at * 6.

Finally, Plaintiffs have standing based on their allegations that Rentokil imposed a unlawful surcharge on them in violation of ERISA. As noted, *supra*, "ERISA's antidiscrimination rules prohibit [Defendants] from imposing a tobacco surcharge, unless 'all of the [regulatory] requirements' of its outcome-based wellness program are 'satisfied.' " *Chirinian*, 2025 WL 2147271, at *5 (quoting 29 C.F.R. § 2590.702(f)(4)); see 78 Fed. Reg. 33158, 33160 (explaining that the regulations provide "criteria for a program of health promotion or disease prevention ... *that must be satisfied* in order for the plan or issuer to qualify for an exception to the prohibition on discrimination based on health status" (emphasis added)); see also 29 U.S.C. § 1182(b)(2)(B) (laying out exception to ERISA's anti-discrimination provisions for discounts established in connection with wellness programs); 42 U.S.C. § 300gg-4(j)(1)(C) (explaining that wellness programs must comply with the requirements of the section to be lawful). Plaintiffs allege that Rentokil is administering a non-compliant program and is, therefore, imposing on them an unlawful surcharge. In other words, "if the surcharge is illegal, it matters not whether [Plaintiffs] can get out of paying it and whether [they] knew of those steps. Rather [Plaintiffs have] the right to not to be charged an illegal surcharge in the first instance." *Bailey,* 2025 WL 2779899, at *6; *See also Baker v. 7-Eleven Inc.,* 2026 WL 473252, at *2 (N.D. Tex. February 19, 2026) Rentokil imposed a surcharge on Plaintiffs. Plaintiffs allege that the imposition of this surcharge by Rentokil, in the first instance, is unlawful because it violates the requirements of ERISA and the 2013 Regulations. Accepting these allegations as true, as the Court must, Rentokil was not legally authorized to impose the tobacco surcharges in the first instance. Paying a surcharge that Plaintiffs

**14**

had no right to be charged counts as a concrete injury for standing purposes. *See Chirinian v.*, 2025 WL 2147271, at *10.

For the foregoing reasons, Plaintiffs have Article III standing to assert their claims and, therefore, the motion to dismiss for lack of subject matter jurisdiction is denied.

2.   Rule 12(b)(6) motion to dismiss

As part its 12(b)(6) motion to dismiss for failure to state a claim, Rentokil contends that Plaintiffs have not plead a viable ERISA 702 claim because they fail to "allege any facts plausibly suggesting that that it would have been "medically inadvisable" or "unreasonably difficult due to a medical condition" for them to comply with the expected standard of being tobacco-free. As such, they were permissibly charged a Tobacco Surcharge for their tobacco usage under the terms of the wellness program and ERISA." ECF 11-2, p. 16. Rentokil relies on the same argument it made in claiming that Plaintiffs lack standing—that the 2013 Regulations conflict with the statutory language of ERISA and, therefore, the 2013 Regulations are invalid.   The Court rejected this argument, *supra*, and does not need to consider it again.

Rentokil next argues that Plaintiffs' claim that participants are entitled to retroactive reimbursement upon compliance with the expected or alternative standards fails as a matter of law. The Court does not agree.

ERISA, through the PHSA, requires that "[t]he **full reward** under the wellness program shall be made available to all similarly situated individuals." 42 U.S.C. § 300gg-4(j)(3)(D) (emphasis added). In addition, the 2013 Regulations specifically provide that "[t]he same, **full reward** must be provided to that individual [a participant who satisfies the alternative standard] as is provided to individuals who meet the initial standard for that plan year. . . . Plans and issuers have flexibility to determine how to provide the portion of the reward corresponding

to the period before an alternative was satisfied (e.g., payment for the retroactive period or pro rata over the remainder of the year) as long as . . . the individual receives the **full amount** of the reward. . . ." (emphases added). 78 Fed. Reg. 33158 at 33163; 29 C.F.R. § 2590.702 (f)(4)(iv).

The term "full award" is not defined in either ERISA or in the 2013 Regulations.[5] In *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), the Supreme Court overruled its previous decision in *Chevron, USA, Inc. v. National Resources Defense Counsel*, 467 U.S. 837 (1984) which held that federal courts were required to defer to an agency's interpretations of ambiguous terms in a statute. In *Loper Bright*, the Court ruled that it was now up to federal courts to independently interpret ambiguous statutory text. *Loper Bright*, 603 U.S. at 398-401. This Court does not consider the term "full reward" to be ambiguous. However, even if it did, thereby requiring an independent analysis under *Loper Bright,* the Court may still, given the Departments' expertise in ERISA matters, draw on the Departments' body of experience and informed judgment. *Id.* at 394. In this regard, the Preamble to the 2013 Regulations explains that:

> [W]hile an individual may take some time to request, establish, and satisfy a reasonable alternative standard, *the same, full reward* must be provided to that individual as is provided to individuals who meet the initial standard *for that plan year* ... Plans and issuers have flexibility to determine how to provide the portion of the reward corresponding to the period *before an alternative was satisfied* (e.g., payment for the retroactive period or pro rata over the remainder of the year) as long as ... the individual receives the *full amount of the reward.*

78 Fed. Reg. at 33163 (emphasis added).

---

[5] The PHSA defines "reward" as including the "absence of a surcharge." 42 U.S.C. § 300gg-4 (j)(3)(A) ("A reward may be in the form of a discount or rebate of a premium or contribution, a waiver of all or part of a cost-sharing mechanism (such as deductibles, copayments, or coinsurance), *the absence of a surcharge,* or the value of a benefit that would otherwise not be provided under the plan.") (emphasis added))

The Preamble then offers an example which is pertinent to this case: if a participant "satisfies th[e] alternative on April 1, the plan or issuer must provide the premium discounts for January, February, and March." *Id. See also Bokma*, 738 F. Supp. 3d at 904-905 (finding that the plaintiffs "plausibly plead that Defendant violated ERISA Section 702 by impermissibly discriminating against participants in denying retroactive reimbursement during a plan year"); *Baker*, 2026 WL 473252 at * 5 (same); *Mehlberg*, 2025 WL 1260700, at *6 (same); *Lipari-Williams v. Mo. Gaming Co.*, 339 F.R.D. 515, 522 (W.D. Mo. 2021) ("The 'full reward' requires retroactively reimbursing a participant that completes the alternative standard."); *Secretary of Labor v. Macy's, Inc.*, 2021 WL 5359769, at *15 (S.D. Ohio 2021) ("[A]ll seem to agree that the later version of the [the 2013 Regulations] would require a refund of the entire annual amount for anyone who completes the reasonable alternative standard at any point during the year.") Indeed, this is the only reading of "full reward" that makes sense. As stated by the court in *Wilson*, "[w]ere the Court to interpret 'full reward' as [Rentokil] suggests—namely, that the 'full reward' entails only the absence of a surcharge on a going forward basis—the word 'full' would not be given effect. Put differently, if all that ERISA and its implementing regulations require is that participants who complete the program stop paying the surcharge in future pay periods, the statute and 2013 Regulations could have accomplished that objective merely by providing that the 'reward' must be made available. The term 'full reward,' then, must entail something *more* than merely the absence of the surcharge." *Wilson*, 2026 WL196517, at *9.

To support its position, Rentokil relies on the following 2014 FAQ:

Q8: A group health plan charges participants a tobacco premium surcharge but also provides an opportunity to avoid the surcharge if, at the time of enrollment or annual re-enrollment, the participant agrees to participate in (and subsequently completes within the plan year) a tobacco cessation educational program. A participant who is a tobacco user initially declines the opportunity to participate in the

**17**

tobacco cessation program, but joins in the middle of the plan year. Is the plan required to provide the opportunity to avoid the surcharge or provide another reward to the individual for that plan year?

[A.] No. If a participant is provided a reasonable opportunity to enroll in the tobacco cessation program at the beginning of the plan year and qualify for the reward (i.e., avoiding the tobacco premium surcharge) under the program, the plan is not required (but is permitted) to provide another opportunity to avoid the tobacco premium surcharge until renewal or reenrollment for coverage for the next plan year...

See FAQs About Affordable Care Act Implementation (Part XVIII) & Mental Health Parity

Implementation (Jan. 9, 2014), at 6 (available at

https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource12

center/faqs/affordable-care-act-implementation-faqs-part-xviii-mental-health-parity.pdf).

The Court finds that this FAQ does not address the requirement that a plan must provide a full refund to those participants who complete a reasonable alternative standard during the year but rather addresses whether plans must offer multiple opportunities for enrollment after a participant declines an initial request to enroll. The defendant in *Bokma* made a similar argument relying on the same FAQ for the proposition that no retroactive reimbursement was required. Citing *Mehlberg*, the court rejected this argument, explaining that Defendant was conflat[ing] two distinct regulatory requirements." *Bokma,* 785 F. Supp. 3d at 905. The Court explained that the FAQ "places a limitation on opportunities for *enrollment* in a wellness program," whereas "Plaintiffs allege that Defendant fails to satisfy the separate requirement that plans provide participants with the 'full reward' upon *completion* of a program, which may occur at any point during the plan year." *Id.* (emphasis in original.)

Rentokil also argues that Plaintiffs' construction of "full reward" conflicts with the plain language of ERISA 702(b) which requires that awards be granted "for *adherence* to programs

18

of health promotion and disease prevention." 29 U.S.C. § 1182(b)(2)(B) (emphasis added). According to Rentokil, a participant is only adhering to a wellness program if he is participating in that program. Therefore, interpreting "full reward" as requiring reimbursement of surcharges paid *prior* to any adherence to a cessation program would conflict with the language of ERISA 702(b). ECF 11-2, p.18. But the Courts that have considered this issue have found that the terms "adhere" and "full reward" are actually distinct requirements and that there is "no conflict between the requirement that participants "adhere" to a wellness program and that they be refunded for all surcharges paid that plan year if they do so." *Wilson.*, 2026 WL 196517, at *10; *Mehlberg.*, 2025 WL 1260700, at *5–6. Therefore, the Court finds, as a matter of law, that the term "full reward" includes retroactive reimbursement upon compliance with the expected or alternative standard.[6]

In Count II, Plaintiffs assert that Rentokil, as the Plan administrator, breached its fiduciary duties to Plan participants under 29 U.S.C. § 1109. That statute provides, in pertinent part, that:

> [a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate[.]

29 U.S.C. § 1109(a).

---

[6] Some Courts have reached a different conclusion. *See e.g., Plesha v. Ascension Health Alliance,* 2026 WL 279321 at *6 (E.D. Mo. February 3, 2026) ("42 U.S.C. §300gg-4(j)(3)(D) does not require a plan administrator to retroactively reimburse a member for a tobacco use surcharge."); *Williams v. Bally's Management Group, LLC,* 2025 WL 3078747 at *11 (D.R.I. November 4, 2025), (finding the term "full reward" to be ambiguous and declining to impose a retroactive requirement that is not clearly defined in the statute.)

Plaintiffs allege that "[i]nstead of loyally and prudently acting in the best interests of Plan participants, [Rentokil] chose to use Plan assets to exclusively benefit itself, to the detriment of the Plan and its participants, by unlawfully withholding millions of dollars in tobacco surcharges from participants' paychecks and using these funds to offset its own obligations to contribute to the Plan . . . resulting in it receiving a windfall. . . at the expense of Plan participants." ECF 1 at ¶¶ 71, 75.

To state a viable claim for breach of fiduciary duty against Rentokil, Plaintiffs must allege facts sufficient to allow the Court to draw the plausible inference that (1) Rentokil was a Plan fiduciary with respect to the challenged action; (2) Rentokil breached its fiduciary duties; and (3) Rentokil's breach of its fiduciary duties resulted in a loss to the Plan. *See, e.g.,* 29 U.S.C. § 1109; *Mator v. Wesco Distribution, Inc.,* 102 F.4th 172, 184 (3d Cir. 2024).

Plaintiffs allege that Rentokil was a Plan fiduciary because it "exercised discretionary authority and discretionary control respecting the management of the Plan and its surcharge programs, including the decision not to offer a reasonable alternative standard." ECF 1 at ¶ 72. Plaintiffs further allege that Rentokil breached its fiduciary duties by "failing to properly disclose material information about the wellness programs to participants, thereby misleading or depriving them of the ability to make informed decision; administering a wellness program that does not conform with ERISA's anti-discrimination provisions, in violation of ERISA § 404, 29 U.S.C. § 1104(a)(1)(D); acting on behalf of a party whose interests were averse to the interests of the Plan and the interests of its participants (and their beneficiaries), in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(2); and by failing to act prudently and diligently to review the terms of the wellness programs (and the Plan) and Plan communications to ensure they properly complied with the regulatory requirements in violation of 29 U.S.C. § 1104(a)(1)(B)." *Id.* at ¶ 78.

**20**

Finally, Plaintiffs allege that "[a]s a direct and proximate result of these fiduciary breaches, Plaintiffs and members of the Class collectively lost millions of dollars in the form of unlawful surcharges that were deducted from their paychecks." *Id.* at ¶ 79.

In its motion to dismiss, Rentokil argues that it was not acting as a fiduciary but rather as a "settlor" by merely implementing the very tobacco free wellness program it created. Rentokil further argues that Rentokil's collection of surcharges is a "non-fiduciary, ministerial function." According to Rentokil, merely implementing the Plan it created does not involve the exercise of fiduciary duties. *See Secretary of Labor v. Macy's, Inc.*, 2021 WL 5359769, at *18 (S.D. Ohio November 17, 2021) (holding that "implement[ing] a discriminatory wellness program in accordance with the impermissibly discriminatory terms it established when it created the program" is not enough to make Macy's a fiduciary.)

Under ERISA, a person operates as a fiduciary "to the extent ... he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or ... he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). An employer's decisions about the content of a plan are not fiduciary acts themselves. *Pegram* v. *Herdrich*, 530 U.S. 211, 226 (2000), citing *Lockheed Corp. v. Spink*, 517 U.S. 882, (1996)); *Curtiss–Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, (1995) ("[P]lan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."). When plan sponsors adopt, modify or terminate a welfare plan, "they do not act as fiduciaries, but as analogous to the settlers of a trust." *Lockheed Corp.*, 514 U.S. at 890.

In addition, certain administrative acts lack the discretion necessary to impose fiduciary duties on the actor. *See* 29 C.F.R. § 2509.75–8 (listing acts, including "preparation of

**21**

employee communications material" and "collection of contributions and application of contributions as provided in the plan"). Finally, 29 U.S.C. § 1104(a)(1)(A) states "that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and" for the exclusive purpose of "providing benefits to participants and their beneficiaries" and "defraying reasonable expenses of administering the plan." Further, 29 U.S.C. § 1106(b)(1) prevents a fiduciary from dealing "with the assets of the plan in his own interest or for his own account."

In the first instance, Plaintiffs allege that Rentokil acted as both the sponsor of the Plan and the Plan Administrator under 29 U.S.C. § 1002(16). ECF 1 at ¶16. In *Bokma*, the Court, citing Fourth Circuit authority, held that by alleging the Defendant was the Plan Administrator, Plaintiffs "satisfy the initial threshold to plead that Defendant acts a fiduciary in administering the Plan." *Bokma*, 783 F. Supp. 3d at 899 citing *Can. Life Assurance Co. v. Est. of Lebowitz*, 185 F. 3d 231, 237 (4th Cir. 1999) ("By the very nature of the position, a plan administrator is a fiduciary with respect to [its] own policy.") See also *Pegram* 530 U.S. at 222. ("A fiduciary within the meaning of ERISA must be someone acting in the capacity of manager, administrator, or financial adviser to a 'plan[.]'")

Second, while the Court agrees with Rentokil that merely administrating the Plan in accordance with its terms, whether such terms are valid or not, does not qualify as a fiduciary act, Plaintiffs' allegations concern more than merely administering the Plan. For example, Plaintiffs allege that Rentokil withheld millions of dollars in tobacco surcharges from participants' paychecks and used those funds to reduce its own financial obligations to the Plan. ECF 1 at ¶¶ 71, 76. According to Plaintiffs by engaging in such actions, Rentokil "caused the Plan to engage in transactions that constituted a direct or indirect exchange of Plan assets for the benefit of a party

in interest—namely, itself—and improperly used Plan assets for its own financial advantage, in violation of 29 U.S.C. § 1106(a)(1)." *Id.* Plaintiffs claim that by retaining these funds, Rentokil increased its own monies, earned interest on the withheld surcharges and reduced its own financial contributions to the Plan. (*Id.* at ¶ 77.) Plaintiffs further allege that Rentokil failed "to properly disclose material information about the wellness program to participants, thereby misleading or depriving them of the ability to make informed decision [sic] [.]" *Id.* at ¶ 78. Specifically, Plaintiffs allege that Defendants failed to disclose a reasonable alternative standard and failed to disclose material information about the wellness programs to participants, thereby misleading or depriving them of the ability to make informed decision. *Id.* at ¶ ¶ 72, 78. The Court finds these allegations pertain to discretionary decisions regarding management of the Plan, management of the Plan's assets, and responsibilities in the administration of the Plan. 29 U.S.C. § 1002(21)(A); *see Baker,* *2026 WL 473252, at * 6-7; Bailey,* 2025 WL 2779899 at *19; *Bokma,* 783 F. Supp. 3d at 899–900. The Court therefore concludes that Plaintiffs have plausibly alleged that Rentokil acted as fiduciary and breached its fiduciary duties. *Pegram,* 530 U.S. at 226.

Rentokil also argues that even if it was acting as a fiduciary and breached its fiduciary duties, any breach did not result in a loss to the Plan.

Section 1132(a)(2) authorizes suits brought on behalf of the plan. *Mass. Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 142 n.9 (1985). Suits brought on behalf of a plan for violating fiduciary duties must allege that **the plan itself, rather than individuals, was harmed.** *Id.* at 139-140. (finding that § 1109 authorizes recovery for harms to a plan which restores to the plan any losses incurred) (emphasis added).

Once again, Plaintiffs allege that Rentokil withheld the surcharge amounts from participants' paychecks and that by holding these funds in its own account, Rentokil reduced its

**23**

own financial obligations to the Plan, increased its own monies and earned interest on the withheld surcharges. (ECF 1 at ¶¶ 76, 77.) And in their Prayer for Relief, Plaintiffs specifically request, *inter alia,* "[r]elief to the Plan from Defendant for its violations of ERISA § 404, 29 U.S.C. § 1104, under 29 U.S.C. § 1109, including a declaration that the tobacco surcharges are unlawful; *restoration of losses to the Plan* and its participants caused by Defendant's fiduciary violations; disgorgement of any benefits and profits Defendant received or enjoyed from the use of the Plan's assets or violations of ERISA; surcharge; payment to the Plan of the amounts owed to members who paid the surcharges; removal and replacement of the Plan's fiduciaries, and all appropriate injunctive relief, such as an Order requiring Defendant to stop imposing the unlawful and discriminatory surcharges on participants in the future." ECF 1 at p.30, ¶ J.

The majority of courts have held that such allegations, at least at the motion to dismiss stage, are enough to survive a motion to dismiss. See *Bailey*, 2025 WL 2779899, at *20 (holding that allegations that the defendant commingled the funds with its own and enriched itself at the expense of the plan sufficiently pleaded harm to the plan where the plaintiff sought remedies that would rectify that harm); *Mehlberg*, 2025 WL 1260700, at *7 (finding an allegation that the defendant kept the tobacco surcharge instead of depositing into the plan to be sufficient at the motion to dismiss stage); *see also Knight,*2025 WL 4351515 at * 12-13.

On the other hand, the Court in *Chirinian*, 2025 WL 2147271, at *12 found that Plaintiff only alleged individual losses, not plan-wide losses and distinguished the plaintiff's allegations from those in *Mehlberg* where the plaintiff alleged that the surcharges were in fact deposited into the plan's trust rather than the defendant's accounts. The Court also distinguished *Bokma* by observing that losses to individual plan participants are *not* automatically losses *to the*

**24**

*plan* so it is unclear why improper deductions from individual employees' paychecks demonstrates [sic] a loss to the plan." *Id.* (emphasis in original.)

In *Fisher,* 2025 WL 248427, at *7, the Court found that Plaintiff's allegation that the Defendant withheld unlawful tobacco and vaccine surcharges from participants paychecks and used those funds to reduce its own financial obligations to the Plan failed to state a claim under 29 U.S.C. §1106 because Plaintiff did not allege that the Plan language stated that unpaid employer contributions were actually Plan assets and because the fact that defendant used the funds to offset its own costs does not mean that the Plan suffered any harm. *Id.* at *7.

In this case, Plaintiffs do not allege that the tobacco surcharges were ever deposited into the Plan trust, thereby enriching the Plan. Rather, Plaintiffs allege that Rentokil kept the surcharges to offset its own obligations to the Plan, thereby harming the Plan. This Court agrees with the majority view and concludes that, at least at the motion to dismiss stage, Plaintiffs have plausibly alleged a loss to the Plan. The issue of whether any unpaid Rentokil contributions were actually Plan assets can be fleshed out in discovery.